JOHN S. LEONARDO
United States Attorney
District of Arizona
STUART F. DELERY
Acting Assistant Attorney General
MAAME EWUSI-MENSAH FRIMPONG
Deputy Assistant Attorney General
MICHAEL L. BLUME
Director, Consumer Protection Branch
RICHARD GOLDBERG
Assistant Director, Consumer Protection Branch
JESSICA R. GUNDER
Trial Attorney, Consumer Protection Branch
Missouri Bar # 60156
United States Department of Justice
Liberty Square Building - Room 6400 South
450 Fifth Street, NW
Washington, DC 20001
Telephone:  (202) 532-4719
Facsimile:  (202) 514-8742
E-Mail:  jessica.r.gunder@usdoj.gov
Attorneys for the United States

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **No. 2:11CV00390 JAT** |
| v. | |
| BUSINESS RECOVERY SERVICES, LLC a limited liability company, and, | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON LIABILITY |
| BRIAN HESSLER, Individually, and as owner, officer, or manager of Business Recovery Services, LLC, | |
| Defendants. | |

1

Plaintiff, the United States of America, submits the following Memorandum of Points and Authorities in support of its Motion for Summary Judgment on Liability.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     Introduction

Brian Hessler ("Defendant Hessler") and Business Recovery Services[2] ("Defendant BRS") sold recovery goods and services from June 2008 through September 2012.  Defendant Hessler and Defendant BRS (collectively, "Defendants") illegally charged consumers an up-front fee for these items.  This Court entered a preliminary injunction barring Defendants from charging their customers without waiting seven business days after their customer recovers what was lost in the previous transaction.  *See* Doc. #34.  Defendants refused to comply with the preliminary injunction and were then held in civil contempt.  *See* Doc. #117.  Rather than correct their abusive and illegal business practices after they were held in civil contempt by this Court, Defendants instead chose to make false assurances that they would stop their illegal conduct and began selling recovery goods and services under a new name.

In addition to Defendants' illegal charging practices, Defendants have misrepresented material aspects of their recovery goods and services.  As discussed

---

[1] At the hearing held on February 1, 2012, the Court sustained Defendants' objection to producing financial records and similar discovery materials sought by the Government before a determination on liability is made.  As a result, the United States is only seeking summary judgment on Defendants' liability at this time.

[2] Defendant BRS is not represented by counsel.  The United States has filed a motion to strike Defendant Business Recovery Services' Answer (doc. #199), and anticipates seeking default judgment.  However, as default judgment has not yet been entered, the United States includes Defendant BRS in this Motion.

below, this case is especially suited for summary judgment.  The overwhelming evidence, including Defendants' admissions, establishes conclusively that Defendants violated the Telemarketing Sales Rule and Section 5 of the FTC Act.  The record is undisputed and no genuine issue of material fact remains.  Therefore, the Court should grant the Government's Motion for Summary Judgment on Liability.

## II.     The Legal Standards Governing Summary Judgment

Summary judgment shall be granted if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250-51 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  The moving party has the burden of establishing both the lack of any genuine issue of material fact and his entitlement to judgment as a matter of law, and the inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 577 (1986).  The moving party may discharge his burden by showing that there is an absence of evidence to support the non-moving party's case.  *Celotex Corp*., 477 U.S. at 322-23.  The party opposing a motion for summary judgment may not rest upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial, *Anderson*, 477 U.S. at 248, 250.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  *Anderson*, 477 U.S. at 247-48.  A fact is

"material" if it is critical to, or might affect, the outcome of the suit under the governing law. *Id*. at 248. An issue or dispute about a material fact is "genuine" if the evidence is such that a reasonable trier of fact could return a verdict for the non-moving party. *Id*. Furthermore, "if the factual context renders [the non-moving party's] claim implausible . . . [the non-moving party] must come forward with more persuasive evidence to support his claim than would otherwise be necessary" to show there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a trier of fact to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

## III.   The Court Should Enter Summary Judgment on Counts One and Two (Alleging Violations of the Telemarketing Sales Rule)

On August 16, 2004, the President signed into law the Telemarketing and Consumer Fraud and Abuse Prevention Act ("the Telemarketing Act"), 15 U.S.C. § 6101, *et. seq*. The Telemarketing Act directed the Commission to prescribe regulations prohibiting deceptive and abusive telemarketing acts or practices. The Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, became effective on December 31, 1995. It is undisputed that Defendants' scheme violated provisions of the TSR.

### A.   *Defendants are subject to the TSR because they are "sellers" and "telemarketers" engaged in "telemarketing" to "customers" as those terms are defined in the TSR*

Counts One and Two of the Complaint allege that Defendants violated various provisions of the TSR, as discussed in greater detail below. "Telemarketing" is "a plan,

program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call."  16 C.F.R. § 310.2(cc).[3]  Statement of Material Facts ("SOMF") ¶10.  Defendants' business is a plan, program, or campaign to induce consumers to purchase recovery goods and services through the use of one or more telephones and involves more than one interstate telephone call.  Defendants are thus engaged in "telemarketing."

A "person" is "any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity."  16 C.F.R. § 310.2(v).  A "customer" is "any person who is or may be required to pay for goods or services offered through telemarketing."  16 C.F.R. § 310.2(l).  Every consumer that Defendants solicit by telephone is a "customer."  A "seller" is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration."  16 C.F.R. § 310.2(z).  A "telemarketer" is "any person [including corporate entities] who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(bb).  These provisions of the TSR apply to the Defendants because they are "sellers" or "telemarketers" engaged in "telemarketing" to "customers" as those terms are defined in the TSR.  SOMF ¶10.

---

[3] This definition excludes certain catalog sales, not applicable here.

5

**B.      Defendants are subject to the TSR because they do not fall within the TSR's "business-to-business" exemption**

Defendants have argued throughout this litigation that they fall into an exception within the Telemarketing Sales Rule for "[t]elephone calls between a telemarketer and any business" because they sell their recovery goods and services to customers whose previous purchases were from fraudulent work-at-home and business opportunity sellers. 16 C.F.R. § 310.6(7).  This Court considered whether this exception applies, and concluded that "the evidence clearly demonstrates that Defendants sell their recovery kits to individuals who have failed in their efforts to start at-home businesses, not to businesses."  *See* Doc. #117.  Additionally, the Court noted that "[t]he evidence introduced at the contempt hearing demonstrates that most, if not all, of the people to whom Defendants sell their kits attempted to start an at-home business, but never successfully launched a business."  *See* Doc. #118.  The Court concluded that, "the exception at the very least requires an extant business."  *See* Doc. #118.

Defendants filed an interlocutory appeal and sought to have the Ninth Circuit find that the business-to-business exception encompassed their conduct.  The Ninth Circuit affirmed the District Court's orders and noted that "[w]here the prior scam in which telemarketers took advantage of consumers, causing them damage, was a scam promising to help them start their own businesses, we doubt the business-to-business exemption to the command of § 310.4(A)(3) can sensibly be applied."  *United States v. Business Recovery Services, LLC*, 488 F. App'x 188, 189 (9th Cir. 2012).

The conclusion reached by this Court and the Ninth Circuit is bolstered by discovery in this case, which shows that Defendants target consumers that are extremely susceptible to being scammed and know that their customers are not sophisticated businesses.  Indeed, in an Executive Summary Defendant Hessler created in June 2010, he detailed the demographic profile of Defendants' customers as:

> People who need another source of income.   This leads the demographic profile to be:
> 1)     The elderly and senior citizens.   Most people cannot make ends meet on Social Security.
> 2)     The unemployed, particularly the long-term unemployed.
> 3)     The disabled.  Nobody can survive on disability.
> 4)     The naïve.  Who would believe that some stranger would teach you how to "get-rich-quick"?
> 5)     The senile.  They give their money to everybody.
> The overall profile is those people who are most likely to be taken advantage of by slick-talking salespeople.

SOMF ¶15. Defendants are not selling their recovery goods and services to businesses, and this exception is inapplicable.

**C.     *Defendants charged unlawful advance fees for their recovery goods and services (Count One)***

Recovery Room scams are operated by deceptive telemarketers, who call consumers that lost money in previous telemarketing transactions and offer recovery goods or services to help these customers recover the money they lost.  The Federal Trade Commission saw the need to protect consumers from recovery room scams that "falsely promise[] to recover the lost money, or obtain the promised prize, in exchange for a fee paid in advance." 60 Fed. Reg. 43842-10 at 43854.  As a result, the Federal Trade Commission prohibited telemarketers and sellers from:

7

> Requesting or receiving payment of any fee or consideration from a person for goods or services represented to recover or otherwise assist in the return of money or any other item of value paid for by, or promised to, that person in a previous telemarketing transaction until seven (7) business days after such money or other item is delivered to that person.

16 C.F.R. § 310.4(a)(3).

Between July 2008 and October 2012, Defendants sold five different recovery goods and services via telemarketing: Recovery Kits, Contingency Fee Services, Dispute University, eBooks, and Dispute Resolution Kits. SOMF ¶12 and 13. Defendants have admitted that, in most instances, their customers seek to recover money they lost in a previous telemarketing transaction. SOMF ¶14.

- Defendants sold Recovery Kits for an up-front fee from July 2008 to October 2011. SOMF ¶13(a). Defendant Hessler estimated that Defendant BRS sold between 20,000-30,000 Recovery Kits to approximately 10,000 separate customers. SOMF ¶13(a). An up-front fee was charged for each of the Recovery Kits, and as a result, 16 C.F.R. § 310.4(a)(3) was violated every time Defendants sold a Recovery Kit. SOMF ¶13(a) and 16. Defendants' charging practices are especially troublesome because for the majority of Business Recovery Services' existence, the company had a no refund policy. SOMF ¶18, 19. Customers who requested refunds or tried to initiate chargebacks would receive harassing emails and phone calls from Defendants. SOMF ¶18. Consumers' sworn declarations provide evidence of individuals who were charged immediately, and in violation

of 16 C.F.R. § 310.4(a)(3), for these products, and the statements in the declarations are confirmed by Defendants' own admissions.

- The Contingency Fee Services were a recovery service sold from July 2008 to July 2012.  Defendants' typically only solicited customers to purchase Recovery Kits over the telephone, and would not tell customers about the Contingency Fee Services option. SOMF ¶24.  Customers who purchased a Recovery Kit would receive a form that they could use to sign up for the Contingency Fee Services, and those customers would be charged a contingency fee only if Defendants were are able to successfully recover the funds the customer lost in the previous transaction.  SOMF ¶13(b).  Defendants charged Contingency Fee Services customers immediately after they recovered money, and failed to wait the required seven business days, a clear violation of the TSR.  SOMF ¶13(b), 14, and 17.

- After Defendants were held in civil contempt in this action, they stopped selling Recovery Kits, and developed a new line of products: an e-Book, Dispute University membership, and Dispute Resolution Kit.  SOMF ¶13(c), 13(d), 13(e).  These products are also recovery goods or services under the TSR because they are "represented to recover or otherwise assist in the return of money or any other item of value paid for by, or promised to, that person in a previous telemarketing transaction[.]"  SOMF ¶13(c), 13(d), 13(e).  Defendants charged an up-front fee for the e-Book, Dispute University membership, and Dispute Resolution Kit, all in violation of 16 C.F.R. § 310.4(a)(3).  SOMF ¶16.

9

The record in this case is undisputed, and no genuine issue of material fact remains. Defendants violated 16 C.F.R. § 310.4(a)(3) and summary judgment is appropriate on Count One.

### D. Defendants made misrepresentations regarding material aspects of the performance, efficacy, nature, or central characteristics of the goods offered by Defendants (Count Two)

Section 310.3(a)(2)(iii) of the Telemarketing Sales Rule prohibits telemarketers and sellers from misrepresenting any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(iii).   The uncontroverted evidence shows that Defendants repeatedly violated this provision of the TSR.

### 1. Defendants Should be Sanctioned for Failing to Provide Discovery and Refusing to Answer Deposition Questions

As discussed in Sections III(D)(2) and IV below, Defendants frequently made deceptive representations about their recovery goods and services, and have admitted that there was no basis for many of these representations.  However, for other representations, Defendants either refused to answer questions regarding whether there was a basis for the representations, or stated that they were unsure as to whether a basis existed.

Specifically, for the representations contained in paragraphs 27(g), 27(m), 27(u), and 27(ab) of the Government's Statement of Material Facts, Defendants refused to answer whether there was a basis for the particular representation.  When Defendants were deposed regarding these representations, they stated that the business possessed documents that would reveal whether there was a basis for the representations, but never

10

provided those documents to the Government, despite repeated requests.  Similarly, for the representations contained in paragraphs 27(h), 27(k), 27(l), 27(r), and 27(t), Defendants made admissions at the depositions that these statements were untrue and unsupported, however, they also made statements that they thought there may be a basis, but ultimately indicated that they were unsure, and said that they needed to check these unproduced records.

As the Court is well aware, Defendants failed to produce much of the discovery materials sought by the Government in this case.  *See* Doc. #177, 188, and 197.  The Government sought to compel Defendants to produce these materials, and after a hearing on August 22, 2012, the Court ordered Defendants to produce these materials and stated that failure to comply would result "in a finding of contempt[.]" *See* Doc. #188.  On October 30, 2012, the United States filed a Notice with the Court to alert it to Defendants' continued noncompliance and refusal to meet and confer regarding the discovery issues in this case.  *See* Doc. #197.

Federal Rule of Civil Procedure 37(b) provides sanctions that may be imposed when a party fails to obey a discovery order.  These sanctions include "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action . . . [and] prohibiting the disobedient party from supporting or opposing designated claims or defenses." Fed. R. Civ. P. 37(b)(2).  Defendants should not be rewarded for their failure to comply with their discovery obligations and their refusal to review any documents or be prepared to answer questions at the depositions

that were held in this matter.  An appropriate sanction here is to find that the statements outlined in paragraphs 27(g), 27(h), 27(k), 27(l), 27(m), 27(r), 27(t) 27(u), and 27(ab) were misrepresentations, and, should Defendants come forward at this late hour with materials showing a basis for these claims, those materials should be excluded.  *See, e.g., Compaq. Computer Corp. v. Ergonome Inc.*, 387 F.3d 403 (5th Cir. 2004) (affirming sanction where defendants engaged in abusive practices for the sole purpose of frustrating the discovery process); *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253 (2d Cir. 1999) (affirming sanction where defendant did not produce files until the week before trial was set to begin); *Oklahoma Federated Gold and Numismatics Inc. v. Blodgett*, 24 F.3d 136 (10th Cir. 1994) (affirming discovery sanction against *pro se* defendant who failed to respond to interrogatories and requests for production).

### 2.      Defendants' Misrepresentations

Defendants' script misrepresented the efficacy of the Recovery Kits.  When making sales calls for Defendants' Recovery Kits, the sales staff typically did not tell customers about the Contingency Fee Services, and the Contingency Fee Services were not offered to customers on that call.  SOMF ¶24.  Nonetheless, the sales staff was directed to state:

> We have had many successful recoveries, including [name of company or companies the prospective customer purchased from] and its affiliated companies, totaling over [sum] to date[.]

This sum is repeated later in the script:

> To date, Business Recovery Services has assisted in recovering over [sum] for its clients.

12

SOMF ¶24.  The sum indicated in the script was the amount of money Defendants had recovered using both the Recovery Kits and Contingency Fee Services.  SOMF ¶24.  By lumping recoveries from the Recovery Kits and Contingency Fee Services together, Defendants create the perception that the Recovery Kits have been successfully used to recover a large amount of money.  As a result, this portion of the script greatly inflates the performance and efficacy of the Recovery Kits.

The script also contained a paragraph stating:

Thankfully, our efforts have been noticed.  Business Recovery Services has been featured for its efforts in the Arizona Republic and ABC Television.  In the [time period] since we began marketing the "Do-It-Yourself" Business Recovery Kit, the Better Business Bureau has received [number] complaints that were generated from our activities.  As such, the Better Business Bureau has issued a press release about our activities, and even Arizona State Attorney General Terry Goddard has commented about our firm.  Although Business Recovery Services is not a member of the Better Business Bureau, we are recognized for our efforts by the Better Business Bureau.

SOMF ¶21.  Defendants knew this portion of the script was false and misleading as the news articles and items discussed were actually negative reports, warning customers to avoid Defendant BRS.  SOMF ¶21.  This portion of the script was intended to give the impression that Defendants' product was reputable, and was backed by the Arizona Republic, ABC Television, the Better Business Bureau, and the Arizona State Attorney General.  This statement misrepresented the performance and efficacy of the recovery goods and services offered by Defendants.

13

As part of their sales pitch for the Recovery Kits, the sales staff would show customers a document on Business Recovery Services' website titled "Reference List – Successful Recoveries." SOMF ¶26. This document purported to contain the names of individuals who used Defendants recovery goods or services to recover their money. SOMF ¶26. However, the evidence shows that this list included customers who did not use Defendants' recovery goods and services to get their money back. SOMF ¶26. The list also contained the names of customers who received discounts for acting as references for Defendants. SOMF ¶26. Some of the references on this list were individuals who were later employed as salespeople by Defendants, but Defendants continued to use these individuals as references despite the fact that they did not stand in the same position as regular customers in regards to Defendants' products. None of these things were disclosed to potential customers when Defendants' sales staff used this document. SOMF ¶26. Additionally, Defendants did not inform their customers that the names on this list represented only a small fraction of Defendants' customers. SOMF ¶26. Failing to disclose this information inflates how customers perceive the effectiveness and performance of Defendants' Recovery Kits and violates the TSR.

The evidence shows that Defendants had no knowledge of what percentage of customers who purchased their Recovery Kits were able to successfully recover their money. SOMF ¶21. Additionally, Defendants began receiving complaints from unhappy customers stating that they were unable to get refunds from StoresOnline using the Recovery Kits at least as early as October 30, 2009. SOMF ¶22. Nonetheless, between

14

November 2009 and June 2010, Defendants' sales staff regularly told customers that all of their customers were getting refunds, and that the minimum offer StoresOnline was giving out was a 50% refund.  SOMF ¶23.  These statements misrepresented the performance and efficacy of the Recovery Kits.

Defendants record their sales calls with prospective customers, and over the course of discovery in this case, the Government received some of Defendants' recordings. Review of these recordings and the declarations submitted by consumers provide evidence of individual instances in which misrepresentations were made to consumers. See SOMF ¶27.

A common representation identified in the recordings and consumer declarations was to tell prospective customers that they would recover a percentage of what they lost in the previous transaction.  SOMF ¶27(c), 27(e), 27(f), 27(h), 27(i), 27(m), 27(n), 27(q), 27(s).  An example of this sort of representation can be seen where, in response to a prospective customer's inquiry regarding how much money he could expect to get back, the sales person stated,

> We've been seeing refunds anywhere from 50 to 85% and up.  My Tax Club, 85%, My Essential Plans, 85%, PMI, with them being part of Stores, because they're doing the marketing for Stores, and Stores is holding your website, I'm going to say a minimum of 50%, but I can't guarantee that, ok?  But that's what we've seen.

SOMF ¶27(f).  These statements were not true, there was no basis for them, and they misrepresented the performance and efficacy of the Recovery Kits.  SOMF ¶27(f).

15

1   Additionally, despite having no knowledge as to what percentage of the customers
2   who purchased Recovery Kits were able to successfully recover their money, Defendants
3   repeatedly told prospective customers that they had a high rate of success.  SOMF ¶21,
4   27(a), 27(e), 27(i), 27(m), 27(o), 27(p), 27(q), 27(s), 27(u), 27(w).  This includes
5   statements like, "StoresOnline, so far, everyone that has used our kit to assist them in
6   getting their refund, they have offered them – 100% of our clients – a refund of no less
7   than 50% of what they invested."  SOMF ¶27(i).  These statements were not true, and
8   they misrepresented the performance and efficacy of Defendants' Recovery Kits.
9
10
11          The consumer declarations also reveal instances in which Defendants told
12   prospective customers that they would get all of their money back.  SOMF ¶27(b), 27(j),
13   27(ac).  For example, customer Leslie Dahl reports being told that she would get all of
14   her money back, and customer Will Keuper was told that the companies to which he lost
15   money would be calling to make a settlement after he sent out the contents of the
16   Recovery Kit.  SOMF ¶27(b), 27(j).  These statements are prohibited under Section
17   310.3(a)(2)(iii) of the Telemarketing Sales Rule as they misrepresent the performance
18   and efficacy of Defendants' Recovery Kits.
19
20
21          Other representations made on these recordings and evidenced through the
22   consumer declarations do not fit into the categories detailed above, but still constitute
23   misrepresentations.  SOMF ¶27(d), 27(v), 27(x), 27(y), 27(z), 27(aa), 27(ab).  For
24   example, a sales representative told a prospective customer the refund process with E
25   Merchant Club:

16

is a very easy and quick process, so that's going to make it easier on us as well, and there really shouldn't be a whole lot of work involved.  It really wouldn't surprise me one bit if you just sent out the paperwork and, by the time you got a response, they had already issued a credit back to your account.

SOMF ¶27(v).  This statement gives the prospective customer the impression that they will get a refund, and misrepresents the performance and efficacy of the Recovery Kits.  In another instance, a sales representative told a prospective customer that Business Recovery Services had a good rating with the Better Business Bureau.  SOMF ¶27(y).  This statement was untrue as the rating was actually a D or and F at the time, and as a result it misrepresented the reputation of the business and the performance and efficacy of the Recovery Kits.  SOMF ¶27(y).

When making sales calls for Defendants' Recovery Kits, the sales staff typically did not tell customers about the Contingency Fee Services, and the Contingency Fee Services were not offered to customers on that call.  SOMF ¶24.  Nonetheless, Defendants' sales staff would make representations regarding the Contingency Fee Services.  SOMF ¶27(g), 27(h), 27(k), 27(l), 27(r), 27(t).  For example, a member of Defendants' sales staff told a prospective customer that they should not "fret" because Advantage Corporation has "offered 100% of everyone who's used our services a refund, and it is just a negotiations game from then on out, you know, and that's the best part about it – because now you're negotiating with them."   SOMF ¶27(g).  In another instance, a sales representative stated "we do have a 100% offer rate right now on StoresOnline clients, and that means that every client that have utilized our services have

been made an offer in about a 30 or 45-day period of time from StoresOnline to resolve the issue." SOMF ¶27(k). By inserting representations about other products into the sales pitch for the Recovery Kits, Defendants misrepresent the performance and efficacy of the Recovery Kits.

The Court should also find that Defendants misrepresented the performance and efficacy of their Contingency Fee Services. SOMF ¶27(g), 27(h), 27(k), 27(l), 27(r), 27(t). As discussed in Section III(D)(1), *supra*, Defendants were unable to answer questions about the efficacy of their recovery services at the depositions in this case. Defendant Hessler repeatedly stated that he possesses documents that would show when the company was able to secure refunds for consumers, however, he has not turned over this documentation despite number requests and being held in contempt. The Government requests that the Court sanction Defendants by finding that these statements were misrepresentations.

Defendants' own recordings, declarations from consumer victims, and testimony from Defendants' sales staff evidence the misrepresentations made by Defendants, and are confirmed by Defendants' own admissions. Defendants misrepresented the performance and efficacy of their products, and violated Section 310.3(a)(2)(iii) of the Telemarketing Sales Rule. Because the record is undisputed and no genuine issue of material fact remains, summary judgment is appropriate on Count Two of the Complaint.

1
2

**IV.     The Court Should Enter Summary Judgment on Count Three (Alleging Violations of the FTC Act)**

3
4

> **A.     *Legal standard for finding representations, omissions, or practices deceptive under the FTC Act***

5

Section 5 of the FTC Act prohibits unfair and deceptive acts and practices in or

6
7

affecting commerce.  15 U.S.C. § 45.  "An act or practice is deceptive if 'first, there is a

8

representation, omission, or practice that, second, is likely to mislead consumers acting

9

reasonably under the circumstances, and third, the representation, omission, or practice is

10

material.'"  *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001) (citations omitted).

11
12

"A solicitation may be likely to mislead by virtue of the net impression it creates

13

even though the solicitation also contains truthful disclosures."  *FTC v. Cyberspace.com,*

14

*LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006).  Thus, in *FTC v. Brown & Williamson*

15
16

*Tobacco Corp.*, 778 F.2d 35 (D.C. Cir. 1985), the Court found an advertisement's

17

description of cigarette tar content to be deceptive even though fine print in the corner of

18
19

the advertisement truthfully explained how the tar content was measured.  The *Brown &*

20

*Williamson* court reasoned that, under the circumstances, consumers were unlikely to

21

read the fine print in the corner of the ad.  *Id.* at 42-43.  Similarly, in *Floersheim v. FTC*,

22
23

411 F.2d 874 (9th Cir. 1969), the Court found that substantial evidence supported the

24

FTC's determination that the appearance and prominent repetition of the words

25

"Washington D.C." on debt-collecting forms from a private collections company created

26

the deceptive impression that the forms were a demand from the government even though

27
28

the forms contained a small print disclaimer informing recipients that such was not the case. *Id.* at 876-78.

If consumers are likely to have chosen differently but for the deception, the misrepresentation is material. *In the matter of Southwest Sunsites Inc.*, 105 F.T.C. 7, 149 (1985), *aff'd*, 785 F.2d 1431 (9th Cir. 1986), *cert. denied*, 479 U.S. 828 (1986). "Express claims or deliberately-made implied claims used to induce the purchase of a particular product or service are presumed to be material." *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999) (*citing FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994)). Additionally, a representation or omission is material if it is the kind usually relied upon by a reasonably prudent person. *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).

The Government is not required to prove that individual consumers relied on the deceptive acts or practices. *FTC v. Figgie Int'l*, 994 F.2d 595, 605-06 (9th Cir. 1993). "A presumption of actual reliance arises once the Commission has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product." *McGregor v. Cherico*, 206 F.3d 1378, 1388 (11th Cir. 2000) (*quoting Figgie Int'l*, 994 F.2d at 605-06). It is also not required that Defendants made the misrepresentations with an intent to defraud or deceive, or in bad faith. *See, e.g., Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1495 (1st Cir. 1989)*; FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988).

20

**B.      Defendants have made false and unsubstantiated representations regarding the likelihood of a successful recovery using Defendants' recovery goods and services**

The undisputed facts show that Defendants' induced customers to purchase their Recovery Kits by making representations that consumers are likely to recover their money.  These false and unsubstantiated representations have caused many consumers to pay money to Defendants.  In routinely making these false and unsubstantiated representations, Defendants engaged in deceptive acts or practices in violation of Section 5 of the FTC Act and summary judgment should be granted in the Government's favor on Count Three of the Complaint.

Many of the representations discussed in Section IV(D), *supra*, are also deceptive acts and practices that violate the FTC Act.  15 U.S.C. § 45.  Defendants' statements contain representations or omissions that are material, and that are "likely to mislead consumers acting reasonably under the circumstances[.]"  *Gill*, 265 F.3d at 950.

For example, Defendants' script misrepresents the effectiveness of the Recovery Kits by stating the sum of money Defendants had recovered using both the Recovery Kits and Contingency Fee Services.  SOMF ¶20(a).  This is material, and it is also likely to mislead customers, many of whom are unaware that Defendants offer any products besides the Recovery Kits.

Defendants' statements to prospective customers between November 2009 and June 2010 that all of their customers were getting refunds, and that the minimum offer StoresOnline was giving out was a 50% refund also violate the FTC Act.  SOMF ¶23.

21

Similarly, Defendants' representations that customers would recover a percentage of what they lost in the previous transaction (SOMF ¶27(c), 27(e), 27(f), 27(h), 27(i), 27(m), 27(n), 27(q), 27(s)) and Defendants' statements that they had a high rate of success (SOMF ¶21, 27(a), 27(e), 27(i), 27(m), 27(o), 27(p), 27(q), 27(s), 27(u), 27(w)) also violate the FTC Act.  All of these statements are express claims Defendants used to induce customers to purchase the Recovery Kits, and they are presumed to be material. *SlimAmerica, Inc.*, 77 F. Supp. 2d at 1272 (*citing Pantron I Corp.*, 33 F.3d at 1096). These claims are untrue and as they are likely to mislead customers they violate the FTC Act.

Finally, the representations Defendants' sales staff made regarding the Contingency Fee Services when marketing the Recovery Kits violated the FTC Act. SOMF ¶27(g), 27(h), 27(k), 27(l), 27(r), 27(t).   It is not made clear to the customer that the sales representative is discussing a completely separate product – and one that is not even being offered to the customer on that call.  Slipping the word "services" into the middle of a sentence about the percentage of customers who are getting refunds is similar to placing fine print on the corner of an advertisement.  *See Brown & Williamson Tobacco Corp.*, 778 F.2d 35.  It is "likely to mislead by virtue of the net impression it creates." *Cyberspace.com, LLC*, 453 F.3d at 1200.  The information about the percentage of customers is material, and these statements are likely to mislead customers.  As a result, they also violate the FTC Act.

Defendants' deceptive acts and practices violate the FTC Act as they are making representations that are likely to mislead consumers and the representations are material. 15 U.S.C. § 45; *Gill*, 265 F.3d at 950.  The record is undisputed and no genuine issue of material fact remains.  As a result, summary judgment is appropriate on Count Three of the Complaint.

**V.     Defendant Hessler is Individually Liable for Violations of the FTC Act and the Telemarketing Sales Rule**

In order to find Defendant Hessler individually liable for violations of the FTC Act and the TSR, the Government must first demonstrate corporate liability, which the Plaintiff has demonstrated above.  Once the Government has established corporate liability, it "must show that the individual defendants participated directly in the practices or acts or had authority to control them . . . The FTC must then demonstrate the individual had some knowledge of the practices."  *FTC v. Gem Merchandising Corp.*, 87 F.3d 466 (11th Cir. 1996) (*quoting Amy Travel Serv.*, 875 F.2d at 573).  The Government may establish the knowledge requirement by showing "actual knowledge of material representations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth."[4]  *Amy Travel*, 875 F.2d at 574 (*quoting FTC v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282, 1292 (D. Minn. 1985)).  In addition, a principal is liable for misrepresentations

---

[4]  The Government "need not demonstrate . . . that the individual defendant possessed the intent to defraud."  *Jordan Ashley, Inc.*, 1994-1 Trade Case. (CCH) at 72,096 (*citing Amy Travel*, 875 F.2d at 573-74).  In addition, "direct participation in the fraudulent practices and failure to act within one's authority to control such practices is sufficient to establish liability."  *Atlantex Assocs.*, 1987-2 Trade Cas. (CCH) at 59,254 (citations omitted).

23

made by its agents regardless of any efforts of the principal to prevent such misrepresentations. *Southwest Sunsites*, 785 F.2d at 1438-39, *Goodman v. FTC*, 244 F.2d 584, 592-93 (9th Cir. 1957).  Thus, Defendant Hessler is liable for misrepresentations that his salespeople make, even if these misrepresentations were not authorized.

The uncontroverted facts show that Defendant Hessler directly participated in the acts and practices of Defendant BRS.  From July 2008 to September 2012, Defendant Hessler offered recovery goods and services for an advance fee through his company, Business Recovery Services.  As the owner and manager of the business, Defendant Hessler had the authority to control the acts and practices of Defendant BRS.

Defendant Hessler was intimately involved in the day-to-day operations of Business Recovery Services, and was well aware of the various representations made by the sales staff.  SOMF ¶20(g).  When the business first opened, he sat at a desk located in the middle of the sales room, from which he could hear the conversations his sales staff had with prospective customers.  SOMF ¶20(a).  When Business Recovery Services later expanded, Defendant Hessler maintained an office there, and would periodically listen to calls in the sales room.  SOMF ¶20(a).  Defendant Hessler also monitored the statements made by the sales staff by reviewing recordings of sales calls.  SOMF ¶20(b). Additionally, the sales staff and room managers knew to tell Defendant Hessler if they heard anyone saying anything to a prospective customer that was not permitted, and Defendant Hessler would reprimand those employees.  SOMF ¶20(d), 20(f).

1   Defendant Hessler was highly involved in the illegal charging practices used by

2   Business Recovery Services.  When employees would consummate a sale, Defendant

3   Hessler himself would typically be the person who would personally run the customer's

4   credit card.  SOMF ¶20(i).

5   Defendant Hessler controlled the content that was placed upon Business Recovery

6   Services' websites.  SOMF ¶20(h).  The content on the websites included the "Reference

7   List – Successful Recoveries" document that purported to contain the names of

8   individuals who used Defendants recovery goods or services to recover their money.

9   SOMF ¶26.  In reality, however, this list included customers who did not use Defendants'

10   recovery goods and services to get their money back, customers who were later employed

11   and paid by Defendants, and customers who received discounts for acting as references

12   for Defendants.  SOMF ¶26.  Additionally, the customer names on this list represented

13   only a small fraction of Defendants' customers.  SOMF ¶26.  These things were not

14   disclosed to potential customers when Defendants' sales staff used this document.

15   SOMF ¶26.

16   Defendant Hessler drafted the script used by the sales staff, and maintained control

17   over any representations the sales staff made regarding the Recovery Kits and

18   Contingency Fee Services.  SOMF ¶20(c).  That Defendant Hessler himself drafted the

19   script is especially telling because, as discussed above, the script itself contained

20   deceptive representations and omissions.  SOMF ¶24, 25.

1   Defendant Hessler was also responsible for responding to customers who
2   complained or demanded refunds.  SOMF ¶18, 20(e).  As a result, Defendant Hessler had
3
4   knowledge of the consumer complaints the Better Business Bureau forwarded to
5   Defendant BRS, Attorney General complaints, and other complaints consumers filed
6   directly with Defendant BRS regarding its business practices.   These customer
7
8   complaints would frequently include information about the representations made by the
9   sales staff.  SOMF ¶20(e).

10   That Defendant Hessler had the ability to control the operations of Defendant
11   BRS, and participated in and had knowledge of its deception is uncontrovertable.
12
13   Summary judgment is appropriate, and Defendant Hessler should be found individually
14   liable.

15
16                              **<u>CONCLUSION</u>**

17   The Court should find that Defendants have violated both the Federal Trade
18   Commission Act and the Telemarketing Sales Rule, and accordingly are liable for civil
19
20   penalties, consumer redress, and injunctive relief.

21
22   Respectfully submitted this 28th day of February, 2013.
23
24   Of Counsel:                          FOR THE UNITED STATES OF AMERICA:

25   HAROLD E. KIRTZ                      JOHN S. LEONARDO
     Attorney                            United States Attorney
26   Federal Trade Commission            District of Arizona
27   225 Peachtree Street
     Suite 1500                          STUART F. DELERY
28   Atlanta, Georgia 30303              Acting Assistant Attorney General

                                       26

(404) 656-1357 (voice)
(404) 656-1379 (fax)          MAAME EWUSI-MENSAH FRIMPONG
hkirtz@ftc.gov                Deputy Assistant Attorney General

                              MICHAEL S. BLUME
                              Director
                              Consumer Protection Branch

                              RICHARD GOLDBERG
                              Assistant Director
                              Consumer Protection Branch

                               /s *Jessica R. Gunder*
                              JESSICA R. GUNDER
                              Trial Attorney
                              Consumer Protection Branch

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2013, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and emailed a copy of this filing to:

Brian Hessler, *pro se*
businessrecoveryservices@yahoo.com

                               /s *Jessica R. Gunder*
                              JESSICA R. GUNDER
                              Trial Attorney
                              Consumer Protection Branch

27